IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERISOURCEBERGEN DRUG CORPORATION<br><br>v.<br><br>AMERICAN ASSOCIATED DRUGGISTS, INC., d/b/a/ UNITED DRUGS | :<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br><br><br>NO. 05-5927 |

**MEMORANDUM**

**Padova, J.** **January 29, 2008**

## I. OVERVIEW AND SUMMARY

Currently pending in this breach of contract and theft of trade secrets action are two summary judgment motions. The first, filed by Plaintiff AmerisourceBergen Drug Corporation ("ABDC"), seeks summary judgment on its breach of contract claims against American Associated Druggists, Inc. ("United"). In the second, United seeks summary judgment on ABDC's trade secrets claim. While the parties have submitted voluminous summary judgment records, it is abundantly clear that material issues of fact prevent the granting of both pending motions. The record shows that United has defenses to ABDC's contract claims based on facts that, if believed, would demonstrate that no breach occurred. The motion on the trade secrets claim suffers the same problem. ABDC can point to evidence creating a jury issue on whether the price data that United allegedly passed to Cardinal Health Care, Inc. (Cardinal") came from ABDC, and constitutes trade secrets under Pennsylvania law.[1] Accordingly, we deny both motions.

---

[1]ABDC and Cardinal recently reached a settlement of the claim pending between them. Accordingly, Cardinal's summary judgment motion is now moot.

This is the second round of summary judgment motions on this case. In the first round, United moved, *inter alia*, for partial summary judgment on part of ABDC's breach of contract claim, arguing that the parties' Group Purchase Agreement ("GPA") was not breached as a matter of law. We denied the motion, finding that ABDC, as the non-movant, was able to show genuine disputed issues of fact concerning the breach of the GPA claim, including that pharmacy owners would not disclose the type of confidential information protected by the GPA to a competing wholesaler, and that sales volumes and cost of goods calculations were too complex and subjective to be susceptible to being "reverse-engineered" from examining invoices and the content of store shelves. AmerisourceBergen Drug Corp. v. American Associated Druggists, Inc., Civ. A. No. 05-5927, slip op. at 12-14 (E.D. Pa. March 14, 2007). We found that this was sufficient to create triable issues regarding whether the information allegedly disclosed in violation of the GPA was available only from ABDC, and thus had to be deemed confidential information under the definition of that term contained in the GPA.

Because United was unable to articulate its legal argument concerning the scope of the GPA's confidentiality provision without relying on disputed facts, we did not actually interpret the scope of the GPA's confidentiality clause. Having now examined the issue in the context of ABDC's pending motion on the same claim, it is clear that ABDC's interpretation of the scope of the GPA's confidentiality clause is not correct. We conclude that the GPA's confidentiality provision applies only to the type of information actually attached to the GPA in one of its Exhibits. This intent is made all the more clear by the parties' later execution of a second confidentiality agreement (the "CDA") which was much broader in scope.

Also pending is United's motion for summary judgment on ABDC's claim under the

Pennsylvania Uniform Trade Secrets Act ("PUTSA"). United argues that the information at issue here cannot legally constitute a protectable trade secret. We conclude that fact issues concerning the extent to which the allegedly protected information was known outside of ABDC's business, the value of that information, and the ease by which others could acquire it, preclude summary adjudication of the trade secrets claim.

## II. SUMMARY JUDGMENT STANDARD

A Court may grant a Motion for Summary Judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Technologies, Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. A.E.V., Inc.,

182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)). The Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## III. ABDC's MOTION FOR SUMMARY JUDGMENT

ABDC moves for summary judgment on its own breach of contract claims, asserting that there are no genuine issues of fact that United's multiple disclosures and continuous misuse of ABDC's confidential information render it liable. It argues that the data United disclosed to Cardinal constituted "confidential information" under the language of both the GPA and CDA; that the information – specifically lists of store-specific cost of goods ("COGs") information and prices for generic drugs – was not generally available to the public; that United has not shown that it obtained the information from any third party not known by United to be under an obligation of confidentiality to ABDC; and that United cannot establish that it independently developed the ABDC data. Thus, ABDC contends, there is no genuine dispute that the data United gave to Cardinal came from ABDC, was covered by the confidentiality requirements of the GPA and CDA, and that United breached those agreements by giving the information to Cardinal. Accordingly, it asserts it is entitled to partial summary judgment on the issue of liability, reserving the issue of damages for a jury trial.

### A. ABDC's Factual Assertions

ABDC has submitted a Statement of Facts to support its motion, citing depositions, exhibits and our prior Memorandum. United has submitted a counterstatement with citations of its own.[2]

#### 1. The GPA

[2]All Exhibit references in this section, unless otherwise stated, are to ABDC's Exhibits in Support of its Motion for Partial Summary Judgment.

On February 1, 2003, ABDC and United signed the GPA, under which ABDC became one of two wholesalers having the non-exclusive right to offer products and services to United's members. (Exhibits 8 and 9.) Cardinal became the other non-exclusive approved wholesaler. (Id.) The GPA contains a confidentiality clause:

> 10.1 Confidential Information. Each party and their employees or representatives ("Receiving Party") will protect all proprietary and confidential information ("Confidential Information") disclosed by another ("Disclosing Party") and not use it except in connection with the Program or as otherwise agreed. Confidential Information does not include information (i) available on a non-confidential basis, (ii) known or able to be formulated by the Receiving Party, or (iii) required to be disclosed by law. Pricing and payment terms are confidential and Customer and Participating Members will remove such information (or request confidential treatment) if it discloses this Agreement for any reason, including in a Securities and Exchange Commission filing.
>
> 10.2 Agreement Confidential. Customer will only reveal Distributor's Confidential Information to its Members, employees and representatives who need to know it to develop, market, implement and customize the Program, who are informed of its confidential nature and who agree to protect its confidentiality. Customer will not divulge Distributor's Confidential Information to negotiate more favorable agreements with third parties, including manufacturers. . . . Customer will prohibit disclosure of Distributor's Confidential Information to any third party (except for contractors and consultants who need access to confidential information to provide services to Customer and its members) without Distributor's prior written consent, which consent shall not be unreasonably withheld or delayed. . . . The foregoing commitments will survive the termination or expiration of this Agreement.

(Exhibit 8, §10.) The pricing and payment terms of the agreement are discussed in Section 5.1 of the GPA:

> 5.1 Pricing/Payment Terms. Participating Members will pay, within terms, Product costs and Program fees pursuant to payment terms set forth in Exhibit "D" ("Pricing/Payment Terms"). The payment terms will be jointly determined by Distributor and each Participating Member based on that Participating Member's payment preferences (among the selections offered), the historical purchasing and weighted average payment date for that Participating Member, and credit considerations deemed relevant by Distributor in its sole discretion.

(Id., § 5.1.) Exhibit D, "Pricing Terms and Conditions," contains the prices that ABDC will charge to United's Participating Members. Exhibit D, which is the only contract provision referenced in § 5.1 as setting forth the contract's "Pricing/Payment Terms," includes a number of pricing tables or matrices for different geographical areas of the United States. These pricing matrices were used to calculate the COGs that individual United member stores would pay for branded pharmaceutical products purchased from ABDC, depending upon each individual store's location and monthly purchase volumes. (Exhibit D to Exhibit 8.) Many of the COG matrices indicated that a Participating Member's individual COG would be set according to a "Return On Committed Capital" ("ROCC") analysis. (Id.)[3]

Exhibit D also provides that ABDC would sell its "PRO Generics" line of generic drugs and other ancillary products such as fragrances or food items to United's members under "SuperNet" pricing. SuperNet pricing was defined as "special net cost quoted to Participating Members by Distributor." (Exhibit 8.) Finally, Exhibit D contains the financing terms by which each United member would pay for their purchases. Every page of Exhibit D to the GPA is marked with the following legend:

---

[3] As performed by both ABDC and Cardinal, ROCC pricing analysis is a financial calculation used to set a COG figure for an individual store by examining the profitability of that store under a number of variable conditions and potential deal terms. (Exhibit 10, Dep. of J. Brannon, Aug. 7, 2007, at 138:8-146:24; Exhibit 11, Dep. of T. Graham, Aug. 1, 2007, at 50:17-53:1; Exhibit 12, Dep. of M. Quick, Feb. 3, 2006, at 115:11-118:16.) The ROCC analysis includes consideration of myriad objective financial factors such as the account's purchase volume (as measured in dollars paid to the wholesaler on an average monthly basis), percentage of generic drug purchases as compared to branded pharmaceutical purchases (sometimes referred to as the store's "GCR," or "generic compliance ratio"), payment terms, and number of deliveries per week. In addition to these objective factors, the ultimate COG offered under a ROCC analysis often takes into account subjective elements such as the wholesaler's view of a pharmacy's capacity to grow and expand its business, or whether or not the store owner is a prominent or influential member of the local pharmaceutical community. (Exhibits 10 at 138:8-146:24; Exhibit 11 at 50:17-53:1; Exhibit 12 at 115:11-118:16.).

> CONFIDENTIAL.
> Customer will delete this Exhibit (or request confidential treatment) if it discloses this Agreement for any reason, including any SEC filing.

(Id. at Exhibit D.)

The GPA also contains a confidentiality clause directed to United member pharmacies:

> 4.1 Commitment Requirements. Only those Members that (i) are approved by Distributor, (ii) adhere to and abide by the terms, conditions, and other provisions set forth in Exhibit "C", and (iii) purchase from Distributor no less than ninety percent (90%) of all Products it purchases which are distributed by Distributor, as verified quarterly, will have access to the pricing and discounts covered in this Agreement. A Member that meets all of these commitment requirements of this Section 4.1 will be a "Participating Member."

(Id. at §4.1.) Exhibit C to the GPA, referenced in Section 4.1, contains a separate confidentiality clause:

> 4. CONFIDENTIALITY
> Each party and its employees or representatives ("Receiving Party") will protect all proprietary and confidential information ("Confidential Information") disclosed by the other ("Disclosing Party") and not use it except in connection with the Program or as otherwise agreed. Confidential Information does not include information (i) available on a non-confidential basis, (ii) known or able to be formulated by the Receiving Party, or (iii) required to be disclosed by law. Pricing and payment terms are confidential and Customer and Participating Members will remove such information (or request confidential treatment) if it discloses this Agreement for any reason, including in a Securities and Exchange Commission filing.

(Id. at Exhibit C.) Notwithstanding the language of Exhibit C, ABDC has produced no evidence that United's members actually signed the type of confidentiality clause mentioned therein. United contends that it is undisputed that ABDC does not require each of its United member customers to sign agreements like Exhibit C. Finally, it contends that ABDC has admitted that its own customers "leak" information to other wholesalers and buying groups, and that its written offers sometimes fall into its competitors' hands. (United Ex. 6, Dep. of C. Prieve at 215:21-216:3, 257:5-10 (admitting

that ABDC has never sued one of its own customers for disclosing this information, and that only "some" United members signed Prime Vendor Agreements that included the confidentiality provisions of Exhibit C); United Ex. 7, Dep. Of J. Cline at 457:8-14 (admitting that ABDC has required United members to sign Prime Vendor Agreements "in some cases – in some cases, they did, but I'm not – I'm not certain it was a requirement."))

2. Disclosures of Price Information by ABDC under the GPA

Between February 1, 2003 and December 19, 2005, ABDC disclosed pricing and payment information regarding its United member customers to United under the terms of the GPA. (Exhibits 15, 16; see also Exhibit 17, Dep. of C. Semingson, Jan. 11, 2007, at 40:9-41:21, 79:24-82:5.) United, after receiving this information from ABDC, allegedly made much of that information available to its field sales representatives, primarily through an internal sales-management software knows as "Sales Logix." Among other things, the Sales Logix system listed the sales volume, generic compliance ratios ("GCRs"), and COGs for each ABDC United member customer within each sales representative's geographic territory. (Exhibit 17 at 77:11-79:23.) United also distributed printed reports, known as "Account Volume Recap Reports" to its sales force on a quarterly basis, showing the purchase volumes and GCRs for both ABDC and Cardinal customers in each representative's territory. (Exhibit 20, Exhibit 21, Dep. of H. Forgey, Nov. 7, 2006, at 20:14-21:12, Exhibit 4, Dep. of M. Huston, Jan. 5, 2006, at 41:3-45:10.) United concedes that its Sales Logix database contained this information, but it contends that the data was out of date, ABDC has not shown that the data was accurate and covered every store, and that its data was collected from sources other than ABDC, including the store owners themselves. (United CSOF at ¶ 17.)

3. The CDA

In 2005, United announced that it was switching back to a sole-source supplier. United invited ABDC, Cardinal, and a third national wholesaler, McKesson, to submit proposals to become United's exclusive, sole-source wholesaler. As part of this process, on August 11, 2005, ABDC and United signed a second confidentiality agreement, the CDA, to protect their discussions and negotiations towards a possible sole-source contract. (Exhibit 22.) Under the CDA, ABDC agreed to disclose information to United in connection with the bid process, in exchange for United's promise that it would keep the information confidential. (Id.)

Section 1 of the CDA states:

> 1. Definition of Confidential Information. For purposes of this Agreement, "Confidential Information" shall mean any information that is disclosed, furnished or made available by the Disclosing Party to the Recipient, whether in writing or other tangible form, orally or otherwise. Confidential Information shall include, without limitation, (a) information disclosed, furnished or made available by the Disclosing Party to the Recipient about processes, systems, strategic plans, business plans, operating data and other financial statements and data and (b) all analyses, compilations, studies or other documents (regardless of the form in which any such analyses, compilations, studies or other documents are maintained) prepared by the Recipient to the extent they contain or otherwise reflect any information disclosed, furnished or made available by the Disclosing Party to the Recipient.

(Id. at §1.) Section 2 of the CDA excludes certain types of information from the definition of "Confidential Information" set out in § 1. This section states:

> Notwithstanding anything to the contrary set forth in Section 1, above, Confidential Information shall not include **information**:
> (a) **that**, at the time of disclosure to the Recipient, **is generally available to the public**;
> (b) **that**, after disclosure to the Recipient, **becomes generally available to the public**, other than as a result of the breach of this Agreement by Recipient or any other party;
> (c) **that the Recipient can establish was already in its possession** at the time the information was received by the Disclosing Party, provided that the source of the information was not known by the Recipient to be bound to an obligation of confidentiality to the Disclosing Party or any other party with respect to such

> information;
> (d) **that the Recipient receives from a third party**, provided that the source of the information was not known by the Recipient to be bound to an obligation of confidentiality to the Disclosing Party or any other party with respect to such information; and
> (e) **that the Recipient can establish was developed independently** by the Recipient without use, directly or indirectly, of any Confidential Information.

(Id. at § 2 (emphasis added)). Section 3 of the CDA provides as follows:

> 3. Limitations on Disclosure and Use.
>
> (a) The Confidential Information will be kept strictly confidential and will not be disclosed by the Recipient except as specifically permitted by this Agreement or specifically authorized in advance in writing by the Disclosing Party. The Recipient will not take any action that causes any Confidential Information to lose its confidential and proprietary nature or fail to take any reasonable action necessary to prevent any Confidential Information from losing its confidential or proprietary nature. The Recipient will not use, and will not allow the use of, the Confidential Information for any purpose other than for the purpose of considering and evaluating a potential venture, transaction or relationship between ABDC and United.
>
> (b) The Recipient will limit access to Confidential Information to those employees, officers, directors or other authorized representatives of the Recipient who (a) need to know such Confidential Information for the purpose of participating in the consideration and evaluation of a potential venture, transaction or relationship between ABDC and United and (b) are contractually obligated to the Recipient to maintain the Confidential Information under terms and conditions at least as stringent as those provided for herein. The Recipient will inform such employees, officers or directors or authorized representatives of the confidential and proprietary nature of Confidential Information and will take all reasonable and necessary steps to ensure that the terms and conditions of this Agreement are not violated by such persons, including but not limited to those steps that the Recipient would take to protect information of its own that it regards as proprietary or confidential. The Recipient will be responsible and liable for any breach of the terms and conditions of this Agreement by such persons.
>
> (c) **Without limiting the foregoing, United may not (except as required by law) disclose any of ABDC's Confidential Information to a competitor of ABDC or use such information in negotiations with any such competitor in order to reach an agreement with any other party.**

(Id., § 3 (emphasis added)). After signing the CDA, United and ABDC engaged in negotiations

towards a potential sole-source contract for approximately two months, through August and September 2005. (See, e.g., Exhibits 23 - 25 and 28 - 30.)

4. Disclosures of Price Information by ABDC under the CDA

On September 28, 2005, Chuck Prieve sent United Vice President David Goot a series of three computer spreadsheets containing information regarding: 1) the COGs that ABDC was charging to all of its United member customers, 2) ABDC's current pricing for the entire PRO Generics program, and 3) each ABDC customer's purchase volumes, GCRs, and payment terms. (See Exhibits 23, 24, and 25, see also Exhibit 26, Dep. of D. Goot, Jan. 23, 2006, at 20:13-34:12, 49:14-62:17, 90:19-91:14; 135:5-16; Exhibit 27, Dep. of C. Prieve, Aug. 30, 2006, at 43:24-47:13.) Throughout the bidding and negotiation period, ABDC also continued to make periodic disclosures of sales volume information, GCRs, and generic pricing and purchasing updates pursuant to the GPA. (See Exhibits 23, 24 and 25.)

5. United's Alleged Disclosures to Cardinal

On October 19, 2005, United formally announced that it had awarded the sole-source contract to Cardinal. On that same day, United gave ABDC notice of intent to terminate the GPA "without cause," triggering the 60-day termination period set out in the Agreement. (Exhibit 39.) ABDC contends that United disclosed ABDC confidential information to Cardinal both before and after the sole-source decision was announced.

a. The "Please Re-Create" Spreadsheet

On September 12, 2005, United Western Regional Sales Manager Wayne Boese e-mailed to Cardinal Vice President Jeff Brannon, who was then heading up the Cardinal team negotiating the sole-source contract, a spreadsheet listing of every ABDC United customer in California, together

with each customer's dollar-specific average monthly sales volume. (Exhibit 41.) The spreadsheet contained the names and sales volumes of 486 ABDC United member customers, and each customer's average monthly purchases from ABDC for the period June 1, 2004 to May 5, 2005. (Id.)

When forwarding this ABDC information to Brannon, Boese included a cover email which stated: "Please recreate before passing the information on to anyone else so they do not know the origin." (Exhibit 41). Boese testified that he included this instruction in the e-mail as humor and was never meant by him to be taken seriously. He stated that it was a reference to an earlier incident where a store owner commented about "conspiracies" and that he never intended that Brannon alter evidence. (United CSOF at ¶ 33.) Brannon's response stated: "Will do. Looking forward to getting with you soon." (Exhibit 41).

b. The "Who's the Man" Spreadsheet

On or about September 16, 2005, Jeff Brannon received yet another spreadsheet of ABDC customers and dollar-specific sales volumes from United. (Exhibit 47.) United contests that it was the source of the spreadsheet based on Brannon's testimony that he couldn't recall where he obtained it. (United CSOF at ¶ 39.) This spreadsheet listed 1,199 United member pharmacies who were then purchasing from ABDC nationwide. (Exhibit 47.) Brannon forwarded this information to Bill Hayden with a cover e-mail stating, "Who's the man…." (Id.) Hayden forwarded it on to his regional sales chiefs with instructions to begin calling on these ABDC accounts immediately, giving priority to those accounts that were listed as paying ABDC more than $200,000 per month:

> From the attached list we have 171 accounts that purchase $200K/mth or more and represent 50% of the total ABC/United opportunity for the Central Group lets concentrate on those accounts asap. We need to start building these relationships now prior to any contract award so that we will be ahead of the game when and if the announcement is made in our favor.

(Exhibit 48.) In this same forwarding e-mail, Hayden instructed his subordinates: "Do not share or indicate that we have a target list of accounts including volume – approach these accounts as if they are normal prospects." (Exhibit 48.) United contests the inference that the material was obtained from United; it asserts that Hayden did not instruct others to hide this alleged fact. (United CSOF at ¶ 43.) Hayden's instruction was repeated all the way down the Cardinal sales chain of command, from Hayden to the individual field sales force. (Exhibits 48, 49.) For example, one of the several regional sales chiefs who received Hayden's instruction, Craig McMillian, repeated that instruction nearly verbatim when forwarding the "Who's the Man" spreadsheet on to his own sales subordinates. (Exhibit 49.) Cardinal Sales Manager John Stark forwarded the "Who's The Man" list of ABDC customers and volumes to his individual field sales representatives with the instruction "DO NOT PUBLISH." (Exhibit 50 (emphasis in original)).[4]

Tom Graham, another Cardinal sales manager who received McMillian's instruction, passed the "Who's The Man" customer and volume data on to his individual sales representatives with the following statement:

> We are all aware that we are aggressively seeking to open new business over $200,000 in Sales, Right?
>
> THEREFORE I have attached a prospect list that is sorted by two tabs the accounts overall and then by volume on the second tab.
>
> **THIS IS A TOP SECRET LIST, SO IF ASKED YOU HAVE NEVER HEARD OF OR SEEN THIS LIST. It does not exist.**

---

[4]We note that United responds to this assertion by arguing that Stark's 63 page long spreadsheet attachment cannot be the same one Brannon received from United because the original spreadsheet was only 27 pages. United contends that the Stark version is actually a series of spreadsheets that have no connection to United. (United CSOF at ¶ 46.) The issue of whether the spreadsheet disseminated internally at Cardinal was the exact same spreadsheet Boese sent to Brannon is inapposite. The issue raised in the pending motion is whether the spreadsheet contained confidential information as defined by the two agreements, in whatever form, that Boese is claimed to have improperly sent to Brannon.

> A smart agent will see this is a list of current ABC customers and their volume. Target those customers over $200,000 first and then work your way down the list.

(Exhibit 51 (emphasis in original)).

Cardinal has admitted in responses to ABDC's Request for Admission that it received "purported customer names and sales volume information . . . from United," but Cardinal contends that it had no knowledge whether the information was accurate. (Exhibit 43 at 9 no. 16, 10 no. 18.) Cardinal has specifically denied receiving ABDC confidential information, id. at 11 no. 21, but admits it received store volume data, COGs, and generic compliance ratios from United. (Id. at nos. 22-24.) It also admits that it "referenced certain information it received from United when [it] was planning to serve, or make offers to, United member pharmacies under the single-source wholesaler relationship." (Id. at no. 25.)

Jeff Brannon and Bill Hayden, acting as Cardinal's designated corporate representatives for the purposes of testifying about these disclosures, confirmed that the "Who's The Man" spreadsheet was a disclosure of pricing data to Cardinal. (Exhibit 7, Dep. of B. Hayden, Sept. 21, 2007, at 61:18-62:3; Exhibit 10 at 734:15-735:15.) United denies that it was the source of the information contained in the spreadsheet. (United CSOF at ¶ 49.)

c. The "Warning" E-mails

On October 3, 2005, Boese e-mailed Cardinal's Jeff Brannon to warn him that, based upon a recent review of ABDC generic drug pricing to several United members, Cardinal's generic prices were 6% higher than ABDC's. (Exhibit 52.) Boese's October 3 e-mail stated:

> Jeff:
> John Stark has been working with the Cardinal sales team to convert some unhappy ABC members to Cardinal. They just ran a generic analysis on these stores that came

> back with Cardinals generics being 6% higher than ABC!! That's a tough sell. . . . In addition as an ABC store they receive a 6.5% generic rebate and the Cardinal rebate is 6%. (ABC is offering many stores a straight 7% rebate). Jeff, you know if we can figure out this difference so will ABC. We need to work to close this generic price gap.

(Id.)[5]

On the same day, United Vice President of Sales Chriss Semingson sent Brannon an e-mail stating:

> Jeff:
> I have also been doing generic drug pricing in preparation of the upcoming board meeting. Wayne's analysis is on the mark. Cardinal's pricing against the other national wholesalers runs higher AFTER rebates. We have been utilizing the top 200 products for our members in this analysis. This is going to present a problem for us. Generic pricing is so important to the pharmacies and it must be competitively priced. They look closely at this part of their business. Is there anything you can do to negate this difference?

(Exhibit 52.) The "upcoming board meeting" referenced in Semingson's e-mail was the scheduled October 14, 2005 meeting, at which the three competing wholesalers were to present their sole-source bids. (Exhibit 10 at 381:6-382:3.)

By October 4, 2005, Brannon had passed the e-mails from Boese and Semingson up the Cardinal chain of command, and had received approval from his superiors to "make an adjustment" on Cardinal's generic pricing to "be more competitive" with ABDC's pricing. (Exhibit 53.) Brannon was ultimately referred to Cardinal generic drug specialist Matt Erick. In an e-mail to Brannon dated October 4, 2005, Erick stated:

---

[5]United denies that Boese's e-mail was intended as a warning. It asserts that Boese testified that he had made no plans regarding Cardinal prior to the United Board's selection of a sole-source wholesaler. (United CSOF at ¶ 50.) However, we note that the e-mail is dated some two weeks before the sole-source provider was announced. We further note that it is unclear from the context of the e-mail whether Boese and Stark were analyzing United data or Cardinal data.

> . . . We are absolutely willing to do something different here for United. This opportunity is a big piece of business for Cardinal. I am open to doing something special on the top 200 items. In order to come up with the best potential strategy I need to see the prices that ABC is charging on these items. The most recent ABC price comparison we have to date (8-29-05) shows us we are 54 bpt. less on the Top 200 from cost to ABC invoice price. . . . In respect to United could we possibly get the following information:
> 1. The top 200 United generic items with NDC and price.
> 2. An idea on how far off we are to the ABC comparison for the total product mix?

Id. While the Prieve spreadsheets were delivered to United on September 28, 2005, we note that Erick specifically notes that his latest information is from August 29, 2005.

d. The "FYI" Spreadsheet

On October 7, 2005, United's David Goot sent Brannon a spreadsheet, identified as the "FYI Spreadsheet," that compared ABDC's pricing for 104 generic drugs to the prices that Cardinal charged for those same items. (Exhibit 54.) The FYI spreadsheet was sent to Cardinal three days after Erick requested that Bannon get him the ABDC information.

Cardinal generics specialist Matt Erick, testifying as Cardinal's corporate representative regarding United's disclosures of ABDC generic drug prices to Cardinal, stated that Cardinal received the "FYI" spreadsheet from United on or about October 7, 2005, and that although he was personally unable to confirm from independent market sources that the drug prices listed on the sheet were current ABDC prices, United represented that this was so. (Exhibit 56, Dep. of M. Erick, Sept. 21, 2007, at 65:23-71:6.)

In its final sole-source presentation to United on October 14, 2007, Cardinal told the United Board of Directors that it would provide "market competitive pricing" on generic drugs if selected as the sole-source wholesaler. A summary of Cardinal's final sole-source proposal as prepared by

the United executive staff for the United Board contained the following statement regarding the generic drug component of that offer:

> United will develop a changeable list of 100 critical generics that will have market competitive pricing as compared to pricing offered by other major wholesalers, regionals, and generic distributors. The contract pricing will be at least 5% better than ManagedSource pricing. This "discounted" generic price file will be offered exclusively to United Drugs members.

(Exhibit 57.)

e. The "War Games" Spreadsheet

In late September 2005, United sales chief Chriss Semingson instructed United's field sales representatives to prepare a "Territory Analysis" showing which ABDC customers in their territory would stay with United, and which would go with ABDC, if United chose either Cardinal or McKesson as the new sole-source wholesaler. (Exhibit 58.) By October 20, 2005, United had compiled the various Territory Analysis reports for the territories in its Western sales region into a document entitled "Western Regional Worksheet." (Exhibit 59.) United's Western region stretched from the Mississippi River to California, and contained roughly 75% of the 1,600 total United members (and ABDC United member customers) in the United States. (Exhibit 3, Dep. of W. Boese, Nov. 7, 2006, at 111:9-19.) The Western Regional Worksheet listed every ABDC United member customer in the western United States, together with their dollar-specific average monthly payments to ABDC. (Exhibit 59.) On October 20, 2005, one day after Cardinal was chosen for the sole source contract, Wayne Boese forwarded the Western Regional Worksheet to his field sales force with the request that they add a notation to each account indicating how early in the Cardinal Conversion Campaign Cardinal should call on the account. (Id.) In forwarding this Worksheet to his sales subordinates, Boese stated:

> I know we should have had these out yesterday but this is all happening so fast. We need to try to compile good information that we can use to communicate with the Cardinal reps to move the conversions along in an organized manner. . . . Please email me the completed forms and have printed versions available for multiple Cardinal reps on Tuesday.

Id.

On Friday, October 28, 2005, United field sales representative Howard Forgey sent an e-mail to Craig McMillian, Cardinal's regional sales manager for the Southern California region, attaching "an updated version of what I gave you on Tuesday." (Exhibit 61.) Attached to Forgey's e-mail was a spreadsheet entitled "War Games – West Region Worksheet." (Id.) This spreadsheet listed the name of every ABDC United member customer in United's Western Region, broken down by United sales territory, together with each store's average monthly payments to ABDC. (Id.) The "War Games" spreadsheet contains information about ABDC and non-ABDC pharmacies. (United CSOF at ¶ 65.) Both Craig McMillian, the recipient of the "War Games" report, and United's designated corporate representative on this topic, Bill Hayden, testified that Forgey made the "War Games" disclosures to McMillian on October 24 and again on October 28. (Exhibit at 155:12-169:9; Exhibit 14, Dep. of C. McMillian, Aug. 2, 2007, at 151:7-153:22.)

After receiving the "War Games" spreadsheet from Forgey, McMillian gave the information to his assistant, Judy Hiscocks. Hiscocks subsequently distributed multiple versions of the sales volume information in the report to the Cardinal and United field sales personnel in the Western Region for their use in prospecting and tracking the conversion of the listed ABDC accounts. (Exhibit 62; Exhibit 7 at 165:19-169:19.)

In early November 2005, Cardinal loaded the same sales volume data into a special software that it had developed to track the progress of the Cardinal Conversion Campaign, known as the

"WinWatcher" program. This database was made available to the entire Cardinal field sales force for their use in prioritizing and tracking their conversion efforts. (Exhibit 63, Dep. of S. Wallon, Sept. 17, 2007, at 47:6-23, 60:23-62:3, 85:12-87:16, 170:18-171:22; Exhibit 10 at 493:15-495:6, 635:15-636:14.)[6]

f. The "Here You Go" Spreadsheet

On October 25, 2005, Goot's secretary Dar Saucedo sent a spreadsheet listing 236 popular generic drugs and the ABDC sales price, monthly unit sales, and monthly dollar sales for each to Jeff Brannon. (Exhibit 64.) This spreadsheet was e-mailed to Cardinal with a cover e-mail stating, "Here you go." (Id.) ABDC asserts that the information on the "Here You Go" spreadsheet was derived from "the most current ABC purchase report" as reviewed by Frank Turner, a consultant to United on generic drug pricing. (Exhibit 65, Dep. of D. Saucedo, June 26, 2007, at 63:20-65:9.) United responds that: the information on generic drug prices could not have come from ABDC's purchase report because that report does not list generic drug prices; Saucedo did not testify that the "Here You Go" spreadsheet was derived from ABDC information, and United witness Chriss Semingson declared in her affidavit that ABDC reports did not contain generic pricing. (United CSOF at ¶ 71.).

Cardinal generic drug specialist Matt Erick, testifying as Cardinal's corporate representative on the subject of United's disclosure of generic drug pricing to Cardinal, identified the "Here You Go" spreadsheet as a disclosure of ABDC generic drug pricing to Cardinal. (Exhibit 56 at

[6] United asserts that ABDC has not shown that the information loaded into WinWatcher was the same information Cardinal allegedly received from United. (United CSOF at ¶ 69.) We note that the deposition testimony cited by ABDC does not contain testimony that the WinWatcher information was the same information that Cardinal allegedly received from United.

60:19-61:9, 77:23-80:18.)[7] Erick testified that Cardinal used the unit and dollar volume figures and accompanying numerical notations in the "Here You Go" spreadsheet to compile the "Top 100" list of generic drugs that Cardinal subsequently offered to ABDC's customers as part of the Cardinal Conversion Campaign. (Id. at 96:7-97:16.)

g. The Laine Lee Spreadsheet

Cardinal has conceded in responses to ABDC's Requests for Admission that it received cost of goods information from United in a spreadsheet that United employee Laine Lee disclosed to Cardinal. (Exhibit 43 at 12; Exhibit 7 at 33:19-34:23.) The Lee spreadsheet lists information for 38 stores in Lee's territory, only 22 of which were ABDC stores. The spreadsheet also contains handwritten information whose source has not been identified. (United CSOF at ¶ 76.)

---

[7]United's counterstatement, that Erick did not testify that the pricing information was ABDC's or that it came from ABDC (United CSOF at ¶ 72), is not supported by the record. Erick was asked for his knowledge of Cardinal's receipt of information from United on "the Top 200 drugs" and "ABC prices" and he was asked how many times he received such information. He could not recall the exact number, but agreed it was more than twice. Also he was asked:

Q. Okay. Now this spreadsheet that was marked as Exhibit 2, is that one instance of the disclosure of Amerisource generic pricing from United to Cardinal of which you're aware, sir?
A. That's one disclosure of ABC sell referencing some price.
Q. Okay. Umm, what was the next one, if you recall?
A. The next one that I can recall as it relates to spreadsheets or which?
Q. As it relates to a disclosure of Amerisource generic pricing by United to Cardinal.
A. Disclosing of their pricing?
Q. Yes.
A. Umm, I have information of spreadsheets that have pricing information on it references ABC's sell.
Q. That you got from United?
A. That came from United.

(Exhibit 56 at 77:23-80:18.) Thus, United's assertion that Erick did not testify that the pricing information was ABDC's or that it came from ABDC is not supported by the record. Whether the "ABC sell" information was the Prieve spreadsheet or other data United collected is not, however, clearly established by Erick's testimony.

United also admitted in its responses to Interrogatories served by ABDC that Laine Lee disclosed COGs, sales volumes, and generic compliance figures for ABDC stores in his territory to two Cardinal sales representatives, Gary Stahl and Eddy McDaniel, during the first week of November 2005. (Exhibit 70 at 6.) The spreadsheet that Lee provided to Cardinal is an excerpt from a quarterly Account Volume Recap Report issued by United to its sales force, summarizing the purchase history of the accounts in their territories based on data provided by ABDC and Cardinal. (Exhibit 20.)

The Laine Lee spreadsheet contains detailed information on the monthly payment volumes and GCRs of all of the ABDC accounts in Lee's sales territory. Id. The report, dated June 17, 2005, includes each ABDC account's monthly purchase amounts and GCR from June 2004 through April 2005. See id. The spreadsheet was compiled before the CDA was executed. (Compare Exhibit 22 and Exhibit 20.) The spreadsheet lists purchase amounts or payment volumes, not prices. These monthly purchase amounts were taken directly from the monthly "Admin Reports" that ABDC provided to United under the GPA. (See, e.g., Exhibit 15.) ABDC asserts that a comparison of the monthly purchase amounts listed on the Laine Lee spreadsheet with the full year's worth of average monthly purchases listed on the three prior United disclosures of ABDC customer sales volumes – the "Please Re-Create," "Who's The Man," and "War Games" spreadsheets, shows that the average monthly volumes listed on those spreadsheets match the data shown on the sales volume reports that ABDC provided to United. (Exhibit 72.)[8]

---

[8]We note that United asserts that ABDC has not shown where the information in Lee's spreadsheet came from or its accuracy. Specifically, the Please Re-Create spreadsheet contained only California stores' information, while Lee's sales territory included other states. (United CSOF at ¶ 83.) This assertion is supported by the record. The "Please Re-Create" spreadsheet contained only information on California stores; Lee's territory did not include California. However, United

In addition to the sales volume and GCR information listed on the Laine Lee spreadsheet, Lee provided the Cardinal sales representatives with COG figures for twenty-two of the 118 ABDC accounts in his territory. These figures are handwritten in to the left of the printed store data, and are expressed as a cost-plus or cost-minus ("C +" or "C -") figure. Id. Lee testified that the handwritten information came from the stores and was given to Cardinal with the store owners' permission. (United CSOF at ¶ 86.) Lee testified that he gave the Cardinal representative volume information for the twenty-two stores that he received from the store-owner, with that store-owner's permission, after the store-owner expressed that he would stay with United after the conversion. Where the information came from and the purpose Lee had for giving it to Cardinal, is thus in genuine dispute. Lee also testified that COG information on the spreadsheet – which is the only "price information" contained therein – came from his own computer database.

Exhibit 86 is a comparison of the COG figures that ABDC disclosed to United on September 28, 2005, with the COG data that was listed for those same stores on the Laine Lee spreadsheet. Of the twenty-two ABDC customers for which Lee provided a COG figure, eleven match the COG disclosed by ABDC. Id. The account information does not match for the other eleven accounts.

6. ABDC warns United

On November 3, 2005, after United chose Cardinal to be its sole source provider, ABDC's in-house counsel sent a letter to counsel for United, reminding United of its ongoing duty of confidentiality under both the GPA and CDA, and asking United to return to ABDC any "Confidential Information" in its possession. (Exhibit 68.) Also on November 3, 2005, United Sales

---

does not contest that the information could have come from other listed spreadsheets and the Admin Reports.

chief Chriss Semingson issued the following e-mail to her field sales force from United's headquarters in Phoenix, Arizona:

> **VERY IMPORTANT!!! UNITED DRUGS PERSONNEL CANNOT SHARE ANY COST OF GOODS INFORMATION WITH CARDINAL PERSONNEL. DO NOT, UNDER ANY CIRCUMSTANCES, EVEN HINT AT IT. IF CARDINAL GOES IN WITH OUR VALUE ANALYSIS PRELOADED WITH A STORES COST OF GOODS, IT WILL BE VIEWED AS COMING FROM UNTIED [sic]. PER OUR CONTRACT WITH ABC, WE CANNOT SHARE THIS INFORMATION. HOWEVER, IF THE STORE GIVES THE INFORMATION TO CARDINAL, THEN IT CAN BE UTILIZED.**

(Exhibit 69 (emphasis in original)).

7. Why ABDC wanted the confidential information protected.

Sales volumes and GCRs are two of the key elements of the myriad-factor ROCC COG analysis, as that methodology was described by both Cardinal and United representatives. Cardinal sales representatives testified that they would be unable to calculate a prospective customer's COGs or make an offer to that store without this information. (Exhibit 11, Dep. of T. Graham, Aug. 1, 2007, at 52:9-53:1, 386:4-16; Exhibit 4, Dep. of M. Huston, Jan. 5, 2006, at 143:12-144:21.) While ABDC asserts that no publicly available source exists for ABDC's customer pricing and payment information, citing Exhibits 96 - 99 and 101, none of the cited exhibits support this proposition. To the contrary, United contends that the information is widely-available in the market place. (United CSOF at ¶ 96.)

ABDC asserts that it has taken measures to keep its customer pricing and payment information confidential, including requiring its own employees and its customers and suppliers to execute written confidentiality agreements (Exhibit 98 at 6), and requiring individual pharmacists with whom it contracts directly to sign a Prime Vendor Agreement that contains precisely the same

confidentiality provision set forth in the GPA. (Exhibit 101, p. 3.) However, there is no evidence in the record that ABDC has confidentiality agreements with every United pharmacy member listed on United's internal data system, Sales Logix, or in the various spreadsheets, or has ever enforced those agreements.

B. United's Factual Assertions[9]

United collects customer information, such as volume figures, invoice cost of goods, generic compliance ratios, and generic prices from its members. (See United's SOF ¶¶ 21-32, 45-50, 53-61, 65-69.) ABDC's Chuck Prieve testified that "[a]ll the leadership [at ABDC] that had people reporting to them in the field wanted to know what was going on in the field, they'd collect things from there [sic] field people on a regular course of business, whether it had to do with United or anything else pertinent to our business." (United Exhibit 42, Dep. of C. Prieve, Sept. 7, 2007 at 504:4-505:4.) A United member knows its own volume, invoice cost of goods, generic compliance ratio, and generic prices. If a member does not know that information, then it can figure it out by looking at ABDC's invoices. (See, e.g., United's SOF at ¶¶ 4, 22, 25-26, 29-32, 46, 48-51, 53, 57-58, 61, 64.) United asserts that a store's invoice cost of goods, monthly volume, generic compliance ratio, and generic prices are all "available on a non-confidential basis" and "known or able to be formulated by" United. (See United's SOF Exhibit 1, C. Semingson Aff., at ¶¶ 4-6, 12-14; United's SOF at ¶¶ 21-26, 28-32, 46, 50-51, 57-61, 64-65; Cardinal's SOF at ¶¶ 27-30, 36-37, 41-42.)

During the conversion campaign, Cardinal did not make any offers to stores that were

---

[9]In addition to making direct rebuttals to ABDC's statement of facts, United asserts additional facts as material to ABDC's motion for summary judgment. We excerpt only those supplemental facts that are not repetitive of the rebuttal statements already recited.

unwilling to share their volume, generic purchase percentages, and payment terms with Cardinal, and was unwilling to rely on information from United; it required the stores to provide the information, and to support the information with records. (United Exhibit 45, Dep. of J. Brannon, Aug. 7, 2007 at 54:14-55:12; United Exhibit 19, Dep. of J. Brannon, Aug. 8, 2007 at 670:17-671:5; United Exhibit 37, Dep. of T. Graham, Aug. 1, 2007 at 94:9-95:14, 360:20-361:18, 385:22- 386:16; United Exhibit 46, Dep. of B. Hayden, Sept. 21, 2007 at 212:21-214:2.) A Cardinal witness testified that a store that wants an offer from a wholesaler is going to give the wholesaler its volume information "100% of the time." (United Exhibit 37 at 360:7-361:10.) That information was used by a Cardinal analyst to run a ROCC calculation for that store, producing a range of possible COGs that Cardinal could offer the stores.

C. Discussion

1. The confidentiality of pricing information under the GPA

ABDC argues that all of its pricing information, regardless of its source, *unconditionally* constitutes confidential information under the GPA. "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." Murphy v. Duquesne Univ. of The Holy Ghost, 777 A.2d 418, 429 (Pa. 2001). The meaning of a clear and unambiguous contract must be determined from the four corners of the contract. Seven Springs Farm, Inc. v. Croker, 801 A.2d 1212 (Pa. 2002); First Home Sav. Bank, FSB v. Nernberg, 648 A.2d 9, 14 (Pa. Super. 1994). Applying these tenets, we conclude that the confidentiality clause of the GPA is clear and unambiguous.

ABDC bases its pricing information argument on the structure of § 10.1 of the GPA. In the first sentence of the clause, the parties declare that each will "protect all proprietary and confidential

information ('Confidential Information') disclosed by another ('Disclosing Party') . . . ." (Exhibit 8, § 10.1.) The second sentence contains exceptions to the definition of "Confidential Information" covering information "available on a non-confidential basis," or "known or able to be formulated by Receiving Party." (Id.) The third sentence, ABDC argues, makes an exception to the exception when it declares that "Pricing and payment terms are confidential." (Id.) Because price is specifically recited as "confidential," ABDC contends that *all* price and payment information is covered by the provision regardless of whether it was available on a non-confidential basis or from a parties' own sources. It argues that generic pricing, COGs, sales volumes and GCRs all fall within the definition of pricing and payment terms, and are thus unconditionally confidential.

United responds that this interpretation makes an artificial distinction between what is deemed "Confidential Information" in the first sentence – and made subject to the conditions of the second sentence – and a specific example of such information contained in the third. It also argues, as it did in its own earlier summary judgment motion, that the term "Pricing and Payment Terms" is limited to the type of information contained in Exhibit D to the GPA, and not to any other information.[10]

We find that United's interpretation of the scope of the clause is correct: when read in the context of the entire agreement, the statement in the third sentence – that price and payment information is confidential – can be read as only a specific example of what the clause covers, not an "exception to the exception," and was not intended by the parties to be an expression that price

[10] "Pricing/Payment Terms" is defined in § 5.1 of the GPA, which provides that "Participating Members will pay, within terms, Product costs and Program fees pursuant to payment terms set forth in Exhibit 'D' ('Pricing/Payment Terms')." (Emphasis in original.) Exhibit D contains the pricing terms for ABDC's products when ordered by a United member, and payment terms describing when payments are due, based upon the date of product orders.

and payment information is unconditionally confidential. We also agree with United that the scope of § 10.1 is limited to the type of price and payment information in Exhibit D.[11]

In making its argument that the third sentence of § 10.1 creates a species of price information that is not conditioned by the public information exception, ABDC ignores the second clause of the sentence. The parties did not simply say that price information was confidential. Rather, they made a specific reference to the four corners of the GPA itself. The entire sentence reads: "Pricing and payment terms are confidential *and Customer and Participating Members will remove such information (or request confidential treatment) if it discloses* ***this Agreement*** *for any reason, including in a Securities and Exchange Commission filing.* (Exhibit 8, § 10.1 (emphasis added.)) Read in context, United was required to remove the confidential price information ***from the GPA*** if it ever was required to disclose the GPA. This language unambiguously defines the scope of §

---

[11]In the first-round summary judgment motions, United raised as an issue that the term "confidential information" as used in § 10.1 meant **only** the pricing and payment terms in Exhibit D. We did not address this contention directly because we found that issues of fact precluded any finding as a matter of law that this was the intention of the parties. United attempted in the earlier motion to establish through its submissions that store-specific COGs and sales volumes were readily ascertainable from sources other than the confidential information supplied by ABDC (for example by directly asking pharmacy owners, by examining invoices, by looking at store shelves, from general industry knowledge, and through subscription services), and that the information could not be confidential because sales representatives are capable of estimating a store's monthly sales volume and COGs. ABDC, as the non-movant, presented evidence that pharmacy owners would not disclose their own store volumes and COGs to a competing wholesaler, and that sales volumes and COG calculations were too complex and subjective to be susceptible to being "reverse-engineered" from invoices and the content of store shelves. We found that this evidence was sufficient to raise genuine issues of material fact concerning United's showing that the information was available from other sources. Thus, we concluded that ABDC had created a genuine issue of material fact regarding whether United's conduct breached both the GPA and CDA. AmerisourceBergen Drug Corp. v. American Associated Druggists, Inc., Civ. A. No. 05-5927, slip op. at 12-14 (E.D. Pa. March 14, 2007). We note, now, that this evidence, concerning whether information could be reverse engineered, addresses only the issue of whether the various disclosures qualified for the exemption, not whether they satisfied the definition of confidential information in the first place.

10.1 as limited to pricing and payment information contained in the GPA itself, i.e. Exhibit D's pricing terms, and not to any other information otherwise disclosed by ABDC to United.

That the scope of "pricing and payment terms" refers only to Exhibit D is supported by Exhibit D itself, which contains on each of its pages a footer stating:

> CONFIDENTIAL Customer will delete this Exhibit (or request confidential treatment) if it discloses this Agreement for any reason, including any SEC filing.

Having defined § 10.1's "Pricing and Payment Terms" earlier in § 5.1 as meaning Exhibit D, and having used the identical language in Exhibit D that they used in § 5.1 **and nowhere else in the contract**, it is clear that "Pricing and Payment Terms" must refer only to the information in Exhibit D. Accordingly, we hold that ABDC cannot base its breach of contract claim on the GPA unless it can show that United disclosed the type of information contained in Exhibit D to Cardinal.

Exhibit D is a series of regional matrices of prices charged to United members in the United States under the GPA. We find that several of the alleged disclosures could be Exhibit D price information, while several clearly cannot. The Boese "Please Re-Create" e-mail was a spreadsheet listing all of United's ABDC customers in California, together with each customer's dollar-specific average monthly sales volume information for the period June 1, 2004 through May 5, 2005. The September 16, 2005, "Who's the Man" e-mail received by Jeff Brannon was also a spreadsheet listing ABDC customers and their dollar-specific sales volumes. The October 28, 2005, "War Games" e-mail spreadsheet listed the name of every ABDC United member customer in United's Western Region, broken down by United sales territory, together with each store's average monthly payments to ABDC. Sales volume data and average monthly payments data are not information contained in Exhibit D. Thus, ABDC is not entitled to judgment as a matter of law on its claim for

breach of the GPA based on these disclosures because these disclosures do not contain Exhibit D Price and Payment Terms information.

The October 3, 2005, Boese e-mail "warning" to Cardinal's Jeff Brannon contained an analysis comparing ABDC's generic prices to Cardinal's generic prices, advising Cardinal to "close this generic price gap." Chriss Semingson's e-mail of the same day confirmed Boese's warning on generic prices. The October 7, 2005, "FYI Spreadsheet" e-mail from David Goot also compared ABDC's pricing for 104 generic drugs to the prices that Cardinal charged for those same items. Generic prices are clearly part of Exhibit D and thus covered by the confidentiality provisions of § 10.1. The October 25, 2005, "Here You Go" spreadsheet listed 236 popular generic drugs and the ABDC sales price, monthly unit sales, and monthly dollar sales of each. The November 2005, Laine Lee spreadsheet disclosed COGs for ABDC stores in his territory. These e-mails and spreadsheets can, on their face, support a claim for violation of the GPA's confidentiality provision because they allegedly disclosed Exhibit D prices.

However, before we can conclude that these disclosures violated the GPA, ABDC must establish that there are no genuine issues of material fact regarding the source of the disclosed information. We find that there is a genuine issue of material fact as to whether the information actually disclosed falls within the exception contained in the second sentence of § 10.1 for information that is available on a non-confidential basis, or that can be independently gathered. While ABDC has put forth evidence that the information moved from itself to United and then to Cardinal during the sole-source negotiations, United has submitted evidence that it can gather the information from a number of independent sources. We find, based upon the evidence in the record of these motions, that a genuine issue of material fact exists as to whether the disclosures made in

the two October 3, 2005 e-mails, the October 7, 2005 spreadsheet, the October 25, 2005 spreadsheet and the November 2005 spreadsheet fall under the exception to the confidentiality provision in § 10.1. We conclude, accordingly, that ABDC is not entitled to the entry of summary judgment on its claim for breach of the GPA based on these disclosures.

2. The confidentiality of information under the CDA

ABDC also argues that United's disclosures to Cardinal violated the CDA. The CDA was executed in August 2005, when ABDC and United began negotiating the new sole-source agreement. The scope of the CDA's protections is clearly broader than the scope of the GPA as the CDA applies to "any information that is disclosed . . . includ[ing], without limitation . . . financial statements and data and (b) all analyses, compilations, studies or other documents." (ABDC Exhibit 22 at §1. ) Section 2 of the CDA excludes certain types of information from the definition of "Confidential Information" set out in § 1, including information that is generally available to the public; information that becomes generally available to the public, other than as a result of the breach of the CDA; and information that United can establish it already possessed, developed independently, or received from a third party, provided that the source of the information was not known by United to be bound to its own obligation of confidentiality to ABDC. (Id. at § 2.)

ABDC argues that the information United disclosed to Cardinal as part of the sole-source negotiations was covered by the CDA and did not fall within any of the above exceptions. It asserts that the three spreadsheets Chuck Prieve sent to David Goot on September 28, 2005 contained ABDC's COGs for name brand drugs, its generic price list, its sales volumes and its GCRs, all of which qualify as confidential information. It also asserts that the COGs and generic prices were not generally available to the public, that it took measures to ensure that the information was not made

public, and United could only have obtained the information from a source known to United to be under an obligation of confidentiality. Finally, it asserts that United could not have independently developed the ABDC data without using information disclosed to it by ABDC. United responds that ABDC has not shown: (1) any connection between the Prieve spreadsheets and the alleged breaches of the CDA, and (2) that the information in the spreadsheets was confidential.

ABDC has established that the information it disclosed to United in the Prieve spreadsheets contained the same type of information United disclosed to Cardinal in the October 3, 2005, Boese's e-mail "warning" to Cardinal's Jeff Brannon containing the analysis comparing ABDC's generic prices to Cardinal's generic prices; Chriss Semingson's e-mail of the same day confirming Boese's warning on generic prices; the October 7, 2005, "FYI Spreadsheet" e-mail from David Goot comparing ABDC's pricing for 104 generic drugs to the prices that Cardinal charged for those same items; the October 28, 2005, "War Games" e-mail spreadsheet listing the sales volumes for every ABDC United member customer in United's Western Region; the October 25, 2006, "Here You Go" spreadsheet listing the ABDC sales price, monthly unit sales, and monthly dollar sales for 236 generic drugs; and the November 2005, Laine Lee spreadsheet listing COGs, sales volumes, and generic compliance figures for ABDC stores in his territory. Each of these disclosures **can** constitute a violation of the CDA. However, ABDC is not entitled to the entry of summary judgment in its favor on its claim for breach of the CDA unless it can establish that the information does not fall within any of the CDA's exceptions.

The CDA exceptions are different from and broader than the GPA exceptions. While the GPA excluded information available on a non-confidential basis, or which could be independently gathered, the CDA also excluded information "generally available to the public" or already in

United's hands, so long as it did not come to United, or become generally available, due to a breach of the CDA, or because the source of the information breached a confidentiality obligation to ABDC.

The issue of whether the United members were under their own confidentiality obligations to ABDC is an issue of genuine factual dispute. United takes the position that ABDC has produced no evidence that United's members actually signed Ex. C. Further, it contends that it is undisputed that ABDC does not require each of its stores to sign agreements like Ex. C. These assertions are supported by the testimony of Chuck Prieve and Jerry Cline. Prieve testified only that "some" United members signed Prime Vendor Agreements; Cline testified that signing the agreement was not required. On this record, ABDC cannot establish that all possible sources of information in United's possession were bound by confidentiality agreements. Accordingly, it is clear that the entry of summary judgment in ABDC's favor on its claim for breach of the CDA would not be appropriate because ABDC cannot eliminate the possibility that the disclosures fall within the CDA's exceptions.

Accordingly, ABDC's summary judgment motion is denied in its entirety.

## IV. UNITED's SUMMARY JUDGMENT MOTION

United has moved for summary judgment on ABDC's PUTSA claim. The PUTSA creates a statutory cause of action for injunctive relief, compensatory damages and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation. 12 Pa. Cons. Stat. Ann. §§ 5303-4. "Misappropriation" is defined to include:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>     (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> (A) derived from or through a person who had utilized improper means to acquire it;
>
> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302. A "trade secret" is defined to mean:

> a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. "The question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact." Emergency Care Research Inst. v. Guidant Corp., Civ. A. No. 06-1898, 2007 WL 2702455, at *4 (E.D. Pa. Sept. 12, 2007) (quoting Camelot Tech., Inc. v. RadioShack Corp., Civ. A. No. 01-4719, 2003 WL 403125, at *5 (E.D. Pa. Feb. 13, 2003).

The relevant factors used to determine whether information is a trade secret under Pennsylvania law are "substantial secrecy and competitive value to the owner." Id. at *4 (quoting O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003) (quoting Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1228 (Pa. Super. Ct. 1989)). In making this determination, Pennsylvania courts consider several sub-factors:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's

> business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985) (citing Restatement of Torts § 757 comment b (1939)); see also Emergency Care Research Inst., 2007 WL 2702455 at *5 (quoting Pestco, Inc. v. Associated Prods., Inc., 880 A.2d 700, 706 (Pa. Super. Ct. 2005)).

A. Additional Facts[12]

1. Data information gathering by United and ABDC

United gathered its own information on its members. When a member joins United, a "New Account Profile" (currently known as a "Credentialing Application") is completed. The New Account Profile can include the member's contact information, as well as its cost of goods, payment information, and monthly volume figures. United has identified more than 3,800 New Account Profiles it has completed since 1990. (Exhibit 1, C. Semingson Aff. at ¶¶ 4, 5; Exhibit A to C. Semingson Aff.)

When ABDC was putting together its proposal for the sole-source bid, ABDC asked United for the aggregate volume for United's members. United had gathered this information and gave it to ABDC. (Exhibit 83). When asked if he knew how Mike Huston, United's former CEO, obtained the volume information, ABDC's Chuck Prieve testified: "I don't know for certain. But they were his stores. I mean, in his group, so I'm sure he had access to the purchasing records." (Exhibit 41,

---

[12]United has filed a statement of facts in connection with its own motion that is partly duplicative of the statements already analyzed. We review here only those statements, and ABDC's responses, that are in addition to the record established for ABDC's summary judgment motion. All exhibit references in this section, unless otherwise specified, are to the Exhibits to United Drugs' Statement of Facts in Support of its Motion for Summary Judgment.

Dep. of C. Prieve, Aug. 21, 2007 at 99:17-100:7). A number of United's members purchase from more than one wholesaler. United regularly tracks the aggregate monthly sales volumes for its members who purchase from more than one wholesaler so that United can evaluate whether those members are receiving all the rebates and incentives that might be available to them. (Exhibit 1 ¶ 2.) United has also collected invoices from ABDC's customers that list the customers' payment schedule. (Id. at ¶¶ 14, 19; Exhibits A, C, F, and G to C to Exhibit 1.)

In addition to new account profiles and sales volume data, United obtains contracts and proposals from wholesalers, and invoices and monthly statements from pharmacies. (See Exhibit 1, C. Semingson Aff. at ¶ 12.) United's members send invoices to United, and have it check to see that they are being billed correctly. Other times, members will send their invoices to United, and ask it to confirm that they are receiving the correct rebate amounts by comparing those invoices and statements with the volume information being reported to United by their wholesaler. (Id. at ¶¶ 21, 22.) These invoices reflect purchases made from the various wholesalers, including ABDC. (Id. at ¶ 12.) United has produced more than 4,000 invoice pages dating from June 2002 through August 2007. United asserts that one can determine a store's average monthly volume, invoice cost of goods, and payment schedule from these invoices. (Exhibit 1 at ¶¶ 12, 14; Ex. A to C. Semingson Aff.)

In addition to all the documentation collected by United, when United wants to learn about a pharmacy, it typically will ask that pharmacy for the information. (Exhibit 60, Dep. of J. Stark, Nov. 8, 2006 at 56:2-57:19; Exhibit 61, Dep. of B. Camargo, Nov. 8, 2006 at 57:4-25; Exhibit 62, Dep. of W. Boese, Nov. 7, 2006 at 99:6-14; Exhibit 63, Dep. of N. Fallon, Nov. 7, 2006 at 89:1-90:3.) Cardinal also freely admits to collecting market data. (Exhibit 65, Dep. of J. Brannon,

Aug. 8, 2007 at 678:23-679:3; Exhibit 66, Dep. of K. Rossettie, Nov. 5, 2006 at 12:21-14:11, 56:25-57:12; Exhibit 67, Dep. of T. Graham, Aug. 1, 2007 at 348:6-349:22, 369:17-370:7.)

Although United collects market information, it historically has not kept information that it has collected because it does not have the physical space to store all the information, and because the information becomes outdated and can easily be re-obtained. (Exhibit 1 at ¶¶ 5, 6, 11, 12, 13.) United has spreadsheets listing prospective members that include information such as volume. (Exhibits 43 - 47.) United also has information on the generic prices charged by different wholesalers, including ABDC, Cardinal, HD Smith, and McKesson. (Exhibits 48 - 57.)

United also contends that ABDC has itself demonstrated that the kinds of information it claims constitute protected trade secrets in this case may be obtained legitimately. Within a few days after United announced that it had chosen Cardinal as its only approved wholesaler, ABDC began collecting market intelligence on the terms of the new United/Cardinal deal. (Exhibits 2, 3, 4). Through its efforts, less than two weeks after United announced that it had chosen Cardinal, ABDC knew that Cardinal's new offer contained (i) performance incentives of 60% for the first year, that declined to 10% in the fourth year, (ii) a $5,000 per store conversion fee, (iii) generic rebates of 5%-6% to United members, and (iv) a 3.5% generic rebate to United. (Exhibit 3).

At the same time, ABDC began collecting Cardinal's proposals to the United members. These proposals included cost of goods figures, pay terms, conversion allowances, dividend rebates, patronage dividends, generic rebates and restock fees. (See Exhibits 7 -17.) ABDC has also obtained information on Cardinal's pricing terms dating back to at least 2003, including the cost of goods Cardinal charged its customers. (Exhibits 18 - 22.) ABDC has a chart comparing ABDC's and Cardinal's respective deals with United. (Exhibit 23.) ABDC's account managers are told to

track prospects as "a rule of thumb." (Exhibit 24, Dep. of C. Prieve, Sept. 7, 2007 at 654:15-655:5.)

ABDC has information on stores and other buying groups who buy from virtually all the wholesalers. (Exhibits 25 -32.) ABDC has produced documents to United that includes pricing, volume, and revenue figures for thousands of prospective customers from all over the country, and was able to obtain cost of goods, volumes, generic compliance ratios, payment schedules, and revenue figures. (Exhibits 33 - 40.)

When preparing to make an offer to a prospective customer, ABDC's salespeople ask the store for its volume, generic compliance ratio, and payment terms. To verify the information they receive from the stores, ABDC's salespeople ask to look at the store's invoices. (Exhibit 41 at 42:18-43:9, 49:10-21). Jerry Cline, ABDC's Group Vice President of Retail Strategic Accounts, testified that ABDC will not make an offer to a prospective account without first knowing the store's volume. (Exhibit 42, Dep. of J. Cline, Aug. 28, 2007 at 58:3-20, 244:8-20; 246:8-15; 264:13-265:10). Cline believes that for sales representatives to properly do their job, they must request volume information from prospective accounts, and should also request generic purchase information. (Id. at 225:6-227:4.)

ABDC's David Neu testified that in order to make an offer to a prospective account, ABDC asks the accounts for their monthly volume information. (Exhibit 76, Dep. of D. Neu, Aug. 22, 2007 at 14:4-17:4.) Jerry Cline further stated that ABDC will not even make an offer to a prospective account without first knowing the store's volume. (Exhibit 42, Dep. of J. Cline, Aug. 28, 2007 at 58:3-20, 244:8-20; 246:8-15; 264:13-265:10.) Many stores, however, will not release this information. (ABDC CSOF at ¶ 55.) Cline believes that in order to do their job properly, sales representatives must request volume information from prospective accounts, and should also request

generic purchase information. (Exhibit 42 at 225:6-227:4; see also Exhibit 73, Dep. of J. Kurtz, Nov. 7, 2006 at 35:16-37:17; Exhibit 63 at 18:9-11; Exhibit 77, Dep. of A. Gonzales, Nov. 9, 2006 at 89:18-22; Exhibit 78, Dep. of H. Leal, Nov. 9, 2006 at 71:25-72:7; Exhibit 79, Dep. of J. Meyer, Nov. 16, 2006 at 56:6-58:4; Exhibit 66 at 56:25-57:12.)

Both ABDC and United have produced several generic price lists reflecting the prices being charged to multiple wholesalers. (Exhibits 30, 31, 48 - 51.) In one of those spreadsheets, ABDC compared its own generic pricing with the pricing for Cardinal and another wholesaler on 200 different generic drugs. (Exhibit 30.) ABDC admits that it has a procurement group that has the responsibility of collecting generic pricing information from other wholesalers and compiling that information in a database for the company to use. (Exhibit 42 at 235:16-237:3.) David Neu testified that ABDC sales representatives are able to acquire competitor's pricing lists. (Exhibit 76, Dep. of D. Neu, Aug. 22, 2007 at 99:2-9.)

2. COG Information

Invoice COG is the price that a store pays a wholesaler for a drug, without taking into account any rebates, performance allowances, or incentives." (See Exhibit 42 at 41:6-16; Exhibit 62 at 14:2-25.) The "effective cost of goods" is the true price a pharmacy pays a wholesaler after taking into account any applicable rebates, performance allowances, or other incentives that typically are applied at the end of a month. (Exhibit 42 at 41:17-24; Exhibit 69, Dep. of C. Prieve, Aug. 30, 2006 at 112:12-24.) Effective cost of goods is subject to manipulation and exaggeration by the wholesaler; pharmacists using the term "effective cost of goods" generally use it to mean "invoice cost of goods." (ABDC CSOF at ¶ 40.) The difference between a pharmacy's invoice cost of goods and its effective cost of goods can be "substantial." (Exhibit 70 at 175:2-20.) While United asserts

that ABDC only shared invoice cost of goods with United (see Exhibit 41 at 174:6-175:23), ABDC responds that it also shared additional elements that form an effective cost of goods, such as generic drug rebates and other incentives such as pre-payment bonuses and program savings from its managed care plan, which ABDC claims United also disclosed to Cardinal. (ABDC CSOF at ¶ 42.)

Although ABDC asserts that it considers its price data to be proprietary, it does not control its customer's COG information. ABDC's Director of Programs for the West Region, Rich Hazinski, testified that "the cost of goods is the customer's. You know, if they choose to share that, I – I can't prohibit them from doing that, as far as I know." (Exhibit 70 at 70:4-7.) Duane Farrar, an ABDC Account Manager, testified that he saw nothing wrong with a pharmacy sharing its cost of goods, because it was the pharmacy's choice whether to do so. (Exhibit 71, Dep. of D. Farrar, Jan. 24, 2006 at 32:9-21.)

Wholesalers and the buying groups routinely ask stores for their invoice cost of goods, and in many but not all instances the stores are willing to share that information. (See, e.g., Exhibit 42 at 227:9-16; Exhibit 76 at 15:11-16:11; Exhibit 72, Dep. of J. Brannon, Nov. 14, 2006 at 32:11-13, 40:10-43:8; Exhibit 67 at 369:18-370:7; Exhibit 68, Dep. of G. Stahl, Nov. 16, 2006 at 58:11-19.) United's regional sales manager, Jonathan Kurtz, confirmed that cost of goods information is readily available in the marketplace:

> [I]t's available by going into stores and asking the customer. It's not confidential information, there's numerous ways that you can obtain that information. One is by asking the customer directly, two is asking the customer for an invoice, three is taking a look at one of the bottles to see what the cost is on that bottle. It's certainly not confidential information.

(Exhibit 73 at 28:13-19.) However, some store owners testified that they would never disclose their COGs. (ABDC CSOF at ¶ 46.)

ABDC's David Neu testified that the stores, not ABDC, own their volume information. (Exhibit 76 at 165:19-166:2.) Neu was asked if a non-disclosure agreement signed between ABDC and Topco as part of their supply contract negotiations authorized Topco to use volume information. Nie responded "I don't think that came up because they [Topco] had all the information because the owners [Topco's member supermarkets] owned them [the volume information]." (Id.) Chuck Prieve testified that ABDC will not release volume figures for its customers unless the customers first give ABDC permission to release the information. (Exhibit 41 at 160:22-161:14.)

ABDC admits that its customers "leak" information to other wholesalers or to buying groups, and that its written offers sometimes fall into competitors' hands. (Exhibit 64 at 425:16-426:3, 436:21-437:5.) ABDC has never sued one of its customers for misappropriation of trade secrets. (Exhibit 42 at 168:15-20.) When ABDC representatives ask prospects for their financial information, the representatives never ask the prospects if they are subject to a confidentiality agreement with their wholesaler. (Id. at 245:2-6).

United asserts that if a store will not share its invoice cost of goods, it can be reverse engineered simply by looking at an invoice. (See Exhibit 42 at 114:22-115:12; Exhibit 41 at 49:10-21; Exhibit 70 at 74:23-75:9; Exhibit 72 at 42:8-43:8; Exhibit 75, Dep. of E. McDaniel, Nov. 15, 2007 at 13:25-15:10.) ABDC asserts that such an effort would be prohibitively time consuming and expensive to undertake. (ABDC CSOF at ¶ 48.)

For some of its customers, ABDC prints the invoice cost of goods on its invoice. If the figure is not provided, COG can be calculated by the wholesale acquisition cost of a brand name drug with the price reflected on the invoice. The difference between the two is the store's invoice cost of goods. (Exhibit 75 at 13:25-15:10; Exhibit 1 at ¶¶ 16, 17.) United has calculated the invoice cost

of goods for at least five stores that gave United their invoices. (Id. at ¶¶ 15, 19; ABDC CSOF at ¶ 50.) ABDC admits that anyone can calculate a store's average monthly volume simply by adding up the total purchases for the month as listed on the invoices. United has done this with the ABDC invoices it collects from ABDC's customers. (Exhibit 41 at 49:10-50:17.) ABDC's Chuck Prieve also testified how he would go about making the calculation. (Id.)

United's witnesses have also testified that experienced salespeople can estimate a store's average monthly volume based on the products on the store's shelves, the customer traffic, and the prescriptions filled. However, each conditioned their answers to the effect that volume could only be estimated to within a tolerance of $50,000 to $100,000. (Exhibit 61, Dep. of B. Camargo, Nov. 8, 2007 at 34:1-35:9; Exhibit 80, Dep. of L. Davis, Nov. 13, 2007 at 21:10-15; Exhibit 81, Dep. of S. Balas, Nov. 14, 2007 at 40:16-41:19.)

B. Discussion.

United argues that all of the information that ABDC asserts constitutes its own trade secrets is actually information belonging to ABDC's customers, and is not protected under the PUTSA. United relies on admissions by ABDC establishing that COG information belongs to the customer, not to ABDC; that customers are free to share their own COG information; that wholesalers and the buying groups routinely ask stores for their invoice cost of goods; that COG information is readily available in the marketplace by asking the customer directly, by examining invoices, or by looking at products on store shelves; and that ABDC asks its prospective accounts for their monthly volume information. United asserts it is able to obtain information from its own members. Citing, *inter alia*, Brett Senior & Assoc., P.C. v. Fitzgerald, Civ. A. No. 06-1412, 2007 WL 2043377 (E.D. Pa. July 13, 2007), United argues that, while customer data can be entitled to trade secret protection under

PUTSA, the customer data at issue here is

> at the "very periphery" of the law of unfair competition. A determination of whether a particular compilation of customer data merits protection as a trade secret must be made on a case-by-case basis, and several limitations apply: neither information that can be readily obtained from another source nor information that is not the plaintiff's intellectual property qualifies as a trade secret.

Id. at *6 (citing Pestco, Inc. v. Assoc. Prods., Inc., 880 A.2d 700, 707 (Pa. Super. Ct. 2005); Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1228 (Pa. Super. Ct. 1989)). Because its members' COGs and sales volumes are readily obtained from other sources including the store owners themselves, and belong to the store owners and not to ABDC, United asserts they cannot constitute trade secrets under PUTSA.

In Brett Senior & Assoc., the plaintiff accounting firm alleged that a former accountant employee misappropriated trade secrets. The Court determined that the information at issue, the accountant's client list, pricing information, and the services he had performed for the clients, belonged to the accountant and not to his former firm, stating that:

> Pricing information was also obtainable from [the accountant's] own papers, as he issued the invoices for the work he performed. . . . The price charged was also available from the clients themselves. Several courts have recognized that prices charged are not protectable because they can be obtained by the customer.

Id. at *7 (citing SI Handling, 753 F.2d at 1257, 1260 (holding that Pennsylvania law differentiates between pure pricing information, readily obtainable from other sources, and proprietary pricing formulae derived from "a whole range of data relating to materials, labor, overhead, and profit margin," which is entitled to protection as a trade secret); and Tyson Metal Prods., Inc. v. McCann, 546 A.2d 119, 121-22 (Pa. Super. Ct. 1988) (holding that pricing information could be obtained from other sources and therefore trade secret protection was unwarranted)). United argues that the

information at issue here is no different. The COGs, GCRs and sales volumes were available from ABDC's clients, the pharmacy owners themselves, and thus cannot be ABDC's trade secrets.

In SI Handling, the United States Court of Appeals for the Third Circuit distinguished simple price information from price information that was based on complex formulae. In the first instance, the trade secret claim involved the defendant's knowledge of the existence of alternative suppliers of the type of bearings it used in its product, and the prices each charged therefor. The Court refused to find that this type of knowledge was an independent trade secret. Id. at 1257 (holding that, "[t]o the extent that knowledge of alternative suppliers of these bearings, and their respective prices, was dependent on knowing the secret specifications, this information would seem to be secret as well. . . . We do not, however, recognize this as an independent trade secret." (Internal citation omitted)). The identity of vendors and the prices of their merchandise, however, was shown by the record to have already been in the hands of third parties, i.e. the alternative suppliers themselves, who had every right to disclose their prices to their prospective customers. Id. To prevent the defendant from using the information, the Court determined, would "put an undue burden on the innocent vendors, as well as place an artificial constraint on the free market." Id. This is because sources and costs are "something that would be learned in any productive industry." Id. (quoting Van Prods. Co. v. Gen. Welding and Fabricating Co., 213 A.2d 769, 776 (Pa. 1965)).

United analogizes the Third Circuit's holding with respect to simple price information to ABDC's trade secret claims because the prices charged to each pharmacy were known to the pharmacies themselves, who were free to disclose them. However, in SI Holdings, the Court distinguished between simple pricing information and the "costing and pricing information" for the plaintiff's finished product, which involved "a whole range of data relating to materials, labor,

overhead, and profit margin, among other things." Id. at 1260 (holding that "unlike the price of bearings, this is not information that is readily obtainable by anyone in the industry. We believe such information qualifies for trade secret protection."). Thus, the question we must address is whether the United member pharmacies' COGs, GCRs, and sales volumes are "simple pricing data" that they themselves own, or are they proprietary "formulae" owned by ABDC. Evaluating the factors listed in SI Holdings, we find that the information here is closer to the kind of proprietary formulae recognized as protectable in SI Holdings, than it is to simple price data.

The information that United allegedly gave Cardinal was not merely one particular store's COG, GCR and sales volume. Rather it was a compilation of the COGs, GCRs and sales volumes for all of the United members being serviced by ABDC under the GPA. It is clear that a compilation of data that has independent economic value can be protected as a trade secret. See e.g., Nat'l. Risk Mgmt., Inc. v. Bramwell, 819 F. Supp. 417, 430-31 (E.D. Pa. 1993) (holding that customer information, such as costing and price information, compiled by a business represents a material investment of time and money and constitutes a valuable asset); Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 842-43 (Pa. 1957) (holding that customer data on, and confidential route of, door-to-door salesmen's customers were entitled to protection as trade secrets). While individual store information may or may not belong to the store owner, the *compilation* of this information – its aggregation and organization into the spreadsheets that were allegedly disclosed – clearly does not belong to the individual stores. The record does not establish that the compilation of information was readily obtainable from publicly available sources; the record also shows that it could only be compiled through concerted effort. In addition, ABDC asserts that it gave United additional non-public information that allowed it to learn not only its COGs but also its effective cost of goods.

This information includes generic drug rebates and other incentives such as pre-payment bonuses and program savings from its managed care plan. It asserts that United disclosed to Cardinal not only ABDC's invoice cost of goods but also this other information, which permitted Cardinal to learn its effective cost of goods.

Individual store owners may know their own data, but they do not know their fellow United members' data. Thus, the first factor identified in S.I. Holdings – the extent to which the information is known outside of ABDC's business – supports a finding that the compilation was a trade secret.

In addition, the extent to which the compilation of data was known by ABDC's employees was established by ABDC to be quite limited. ABDC's "intranet" internal computer systems is controlled by security passwords and ID codes that are issued to employees; this data is not generally available to the public. (See ABDC Exhibit 97.) The ABDC computer systems on which it stores its customer pricing and payment data each require separate passwords and authorization, which are granted only to those who need to have access to that data in order to perform their jobs. Id. Only 1120 out of some 8,000 ABDC employees – less than 15% – have access to this pricing and payment data. Id.

We also find that there are genuine issues of material fact regarding the measures taken by ABDC to guard the secrecy of this information. Construing the record in non-movant ABDC's favor, we find there are genuine issues of fact regarding whether ABDC requires third parties to sign confidentiality agreements before disclosing its pricing and payment information. More importantly, United has not affirmatively established any other voluntary disclosures by ABDC of the compilations to third parties.

There is also a genuine issue of material fact as to the value of this information to ABDC and

its competitors. United maintains that it and the other market participants each independently compile market information, and that, historically, it has not kept this information because it becomes quickly outdated and it can easily obtain the information again if necessary. ABDC disputes the ease at which the information can be collected and asserts that this information has clear value, otherwise United's Wayne Boese would not have gone to such lengths to hide the source of the disclosure. ABDC also asserts that the value of the information is clear from the fact that Cardinal lowered its prices in its sole-source bid once it learned from Boese that ABDC had the better bid.

United contends that this information may be easily acquired or duplicated by others, that it does not store market information because it so is easily assembled, and that COGs can be ascertained merely by looking at invoices from each store. ABDC asserts that it is virtually impossible to accurately estimate a store's volume just by looking at the products on the store's shelves, the customer traffic, and the prescriptions filled, and that such estimates could only be made to within a tolerance of $50,000 to $100,000. ABDC also asserts that compiling stores' COGs would depend upon the cooperation of every store owner and that store owners have testified that they will not disclose this information. Construing the record in ABDC's favor, we find that there is a genuine issue of material fact as to whether this information may be easily duplicated by others.[13]

Applying the SI Holding factors, we find that any analysis of whether or not the COGs, GCRs and sales volume information can qualify as trade secrets is dependant upon the resolution of disputed questions of fact. As these factual issues must go to the jury, it is clear that the entry of

[13]Neither party has offered anything in the summary judgment record specific to the factor of the amount of effort or money expended by ABDC in developing the information.

summary judgment in United's favor on ABDC's PUTSA claim would not be appropriate. United's cross-motion for summary judgment is, accordingly, denied.

## V. CONCLUSIONS

Having carefully construed the extensive summary judgment record, we conclude only that certain disclosures, namely the "Please Re-Create" e-mail spreadsheet, the "Who's the Man" e-mail spreadsheet, and the "War Games" e-mail spreadsheet, cannot as a matter of law form the basis of a claim that United breached the GPA. Other than this limited conclusion, we find that genuine issues of material fact preclude granting summary judgment to ABDC on its breach of contract claim or to United on the PUTSA claim.

Among the issues we identify for trial are: (a) What was the source(s) of the information contained in the October 3, 2005 Boese e-mail "warning," the October 3, 2005 Semingson e-mail, the October 7, 2005 Goot "FYI Spreadsheet," the October 25, 2005 "Here You Go" spreadsheet, and the November 2005, Laine Lee spreadsheet? (b) Does the information contained in these alleged disclosures qualify for an exception to the GPA's confidentiality clause because it was available on a non-confidential basis, was known or able to be formulated by United before the information was disclosed by ABDC, or was required to be disclosed by law? (c) Do the alleged disclosures of information protected by the CDA qualify for an exception under that agreement because the information was generally available to the public, became generally available to the public other than as a result of a breach of the CDA by United or any other party, was already in United's possession or was received by United from a third party (other than by way of a breach of a confidentiality agreement), or was developed independently by United? (d) Are United member pharmacies parties to confidentiality agreements with ABDC? (e) Do United member pharmacies willingly share their

COG, sales, and GCR information? (f) Can a store's COG, GCR and average monthly sales volume be determined from non-confidential information? and (g) How easily may this information be collected and does it have value to ABDC and its competitors? In their pre-trial submissions, the parties are encouraged to address these issues.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERISOURCEBERGEN DRUG CORPORATION | : | CIVIL ACTION |
| v. | : | |
| AMERICAN ASSOCIATED DRUGGISTS, INC., d/b/a/ UNITED DRUGS | : | NO. 05-5927 |

**ORDER**

**AND NOW**, this day of January, 2008, **IT IS HEREBY ORDERED** as follows:

1. The motion for partial summary judgment of Plaintiff AmerisourceBergen Drug Corporation (Docket Entry 182) is **DENIED.**

2. The motion for summary judgment of Defendant American Associated Druggists, Inc., d/b/a/ United Drugs (Docket Entry 183) is **DENIED**.

3. The motion for summary judgment of Defendant Cardinal Health, Inc. (Docket Entry 181) is **DENIED AS MOOT**.

BY THE COURT:

S/John R. Padova

______________________
John R. Padova, J.